# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ANWAR HAI KHAN, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 10 C 4063 |
| EVERBANK a/k/a EVERHOME MORTGAGE COMPANY, DIANE SCELSA, ROBERT BORDENET, BILL FITZPATRICK, and BUDDY McCOMBS, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Anwar Khan, a Muslim Pakistani-American man, has sued his former employer EverBank and several of its personnel, Diane Scelsa, Robert Bordenet, Bill Fitzpatrick, Buddy McCombs, alleging discrimination, harassment, and retaliation on the basis of race, national origin, religion, and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981. Defendants have moved for summary judgment on all of Khan's claims. For the reasons stated below, the Court grants defendants' motion.

## Background

Khan filed a response to defendants' Local Rule 56.1(a) statement of facts but failed to respond to every statement of fact. Specifically, Khan failed to respond to defendants' statements numbered nineteen through twenty, twenty-two through twenty-six, twenty-eight through thirty-two, thirty-four through forty-five, fifty-four, fifty-eight

through sixty-one, and seventy-eight through seventy-nine. Khan's failure to comply with Rule 56.1(b) results in the Court accepting as true all facts set out in defendants' Rule 56.1(a) statement to which he did not respond. *See Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003).

EverBank hired Khan as an underwriter liaison at its Rolling Meadows branch on January 20, 2009. Khan assisted underwriters in closing loans by advising brokers on what documentation was needed to meet outstanding loan conditions. Khan was the first underwriter liaison hired in the Rolling Meadows office, and he was also a certified underwriter. He alleges that at some point after he was hired, he heard from another employee that Robert Bordenet, the regional branch manager, had expressed concern about Khan's accent prior to hiring him.

EverBank distributed and trained Khan on its employee handbook and policies at the outset of his employment. The policies explained that normal working hours were from 8 a.m. to 5 p.m. but that the company would consider flexible work arrangements to allow employees to balance work with their personal lives. The policies also required an employee to apply online for an open position for which he wanted to be considered and to have worked in his current position for twelve months to be considered for a promotion. With respect to bonuses, EverBank's policy stated that an employee's bonus would be based on only two components: the team portion, which was based on the entire branch's productivity; and the individual portion, which was based on the employee's personal performance, irrespective of the productivity of the underwriters for whom an employee worked.

Around February 2009, Khan expressed interest to his then supervisor, Colleen

Murphy, in being promoted to an underwriter position. Murphy advised that to be considered for an underwriter position, Khan would need to complete a direct endorsement course with an underwriter, after which Murphy could issue Khan a waiver allowing him to apply. According to Khan, Murphy arranged for Khan to train alongside Steven Blough, an EverBank underwriter. Due to scheduling conflicts, however, Khan was unable to attend, and the training was re-scheduled.

Shortly thereafter, EverBank terminated Murphy and hired Diane Scelsa as Murphy's replacement. When Khan told Scelsa that Murphy had given him permission to take the direct endorsement course, Scelsa revoked Murphy's approval, stating that only underwriters were allowed to take the course. By April 2009, EverBank had hired more underwriter liaisons in its Rolling Meadows office, all of whom Khan alleges were white women.

In May 2009, Khan was working with underwriters Scott Lindblom and Bonnie Brazeau. On June 2, 2009, Scelsa reorganized the working groups. She assigned Khan to work for an additional underwriter, Steven Blough. Five days later, on June 7, 2009, Khan e-mailed Scelsa and Bordenet asking to be assigned to assist only two underwriters, explaining that he had too much work and was having difficulty working with Brazeau. Scelsa replied, stating that she would be rebalancing the groups in the next few weeks. Bordenet also responded, thanking Khan for his e-mail and advising Khan that he should continue to voice his concerns. That same day, Scelsa and Bordenet held a meeting with Khan and Brazeau and asked both to discuss their concerns. As promised, on July 16, 2009, Scelsa re-organized the working groups and removed Brazeau from Khan's group. Khan considered the remaining team, consisting

3

of Blough, Lindblom, and himself, to be a "high producing team." Pl.'s Dep. at 255.

On October 10, 2009, Scelsa re-organized the working groups again, this time removing Blough from Khan's group and asking Khan to work on Lindblom's files and to distribute all uncleared loan conditions to their corresponding files throughout the day. Later that day, Scelsa assigned Lindblom to work with a different underwriter liaison and asked Khan to focus solely on distributing uncleared conditions. On October 20, 2009, Scelsa re-assigned Khan to assist Blough again.

On October 11, 2009, Scelsa e-mailed the entire Rolling Meadows office, asking everyone to provide her with their scheduled work hours so that she could ensure there was overlap in the schedules. She explained that everyone would have to work until 4:30 p.m. because the office was very busy and brokers continued to call late in the afternoon. Khan replied that he would work from 8 a.m. until 4:30 p.m. Prior to this date, Khan had been working until 4 p.m. so that he could avoid rush hour traffic when driving home.

Around the same date, EverBank posted a notice on its website encouraging employees to donate to a charity. EverBank sent a subsequent reminder e-mail to all employees, including Khan. The e-mail did not reference Christmas, and no one at EverBank ever suggested to Khan that he would be penalized if he did not donate to the charity. Khan also alleges that coworkers at EverBank twice invited him to a bar after work. Because his religion forbids him from consuming alcohol, he did not attend.

The placement of Khan's desk changed twice while he was employed at EverBank. Khan first sat in the underwriting department near the underwriters with whom he worked. Everbank subsequently moved his desk to an area outside Scelsa's

4

office.  Later, Everbank moved Khan further from the underwriters, to the lobby near the entrance door.  Khan then suggested using an open space in a copy room that would desks.  Scelsa agreed with the idea and moved two desks into the room.  Scelsa did not allow Khan to move into the room, however, stating that it was reserved for two other employees, both Caucasian women.  Khan inquired about using an space in the corner of the same room, but Scelsa told him it was designated for storage of copy paper.

Khan also claims that on several occasions during his employment, Bill Fitzpatrick, the underwriting manager who occasionally visited the Rolling Meadows office, asked him to get him coffee and that he was treated as the office "coffee boy."  Khan further contends that Buddy McCombs, the senior vice president of wholesale and correspondent lending, once physically pushed him in front of Scelsa while in an office.

On October 22, 2009, after nine months of employment with EverBank, Khan tendered his resignation to Scelsa via e-mail.  He filed an EEOC charge of discrimination on the basis of national origin, race, sex, and religion.  This suit followed.

**Discussion**

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010).  Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment must be granted "[i]f no reasonable jury could find for the party opposing the motion."  *Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 931 (7th Cir.

5

1995).

Defendants have moved for summary judgment on all of Khan's claims. They argue that Khan cannot establish a failure-to-promote, discrimination, harassment, or retaliation claim under Title VII or section 1981 with respect to EverBank or under section 1981 with respect to the individual defendants.

**1.     Failure to promote**

Khan alleges that EverBank discriminated against him based on his race, sex, and national origin by failing to promote him to an underwriter position. He seeks to establish his claim under the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case on his failure-to-promote claim, Khan must establish that he is a member of a protected class, he applied for and was qualified for the position sought, he was rejected, and the employer granted the promotion to someone outside of the protected group who was not better qualified than Khan. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). If Khan establishes those four *prima facie* elements, the "presumption of discrimination created by establishing a prima facie case shifts the burden to the defendant to produce a legitimate, noninvidious reason for its actions." *Hobbs v. City of Chicago*, 573 F.3d 454, 460 (7th Cir. 2009). If EverBank does so, the burden shifts back to Khan to establish that EverBank's proffered reasons are a pretext for discrimination. *Jackson v. City of Chicago*, 552 F.3d 619 (7th Cir. 2009).

At issue between the parties is only the second element of the *prima facie* test – whether Khan ever applied or was qualified for an underwriter position. It is undisputed that EverBank's written policy requires employees to apply online if they wish to be

6

considered for an open position and that Khan never applied for any position online. Nor does Khan dispute that to be eligible to apply for another position, EverBank's policy required him to have worked as an underwriter liaison for at least one year, which he had not done. Khan argues, however, that EverBank often provided waivers of these requirements; his supervisor Colleen Murphy promised him a waiver if he could complete a direct endorsement training program with underwriter Steven Blough; and he lost the opportunity to apply for a promotion when Diane Scelsa subsequently became his supervisor and blocked him from participating in the training program.

Courts have concluded that there is no hard-and-fast application requirement on a failure to promote claim where the plaintiff essentially had no opportunity to apply for a promotion and can show that the defendant was aware of his desire for advancement. *See Williams v. Giant Food Inc.*, 370 F.3d 423, 431 (4th Cir. 2004); *Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 387 (2d Cir. 2000); *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 349 (3d Cir. 1990) ("[R]elaxation of the application element of the prima facie case is especially appropriate when the hiring process itself, rather than just the decision making behind the process, is implicated in the discrimination claim or is otherwise suspect"). This is the sort of claim Khan makes here; he contends, in essence, a discriminatory denial of the opportunity to apply for a promotion. The Court concludes that Khan has met the requirements for a *prima facie* case. A reasonable jury could find that he indicated to the appropriate supervisory personnel his interest in a promotion to an underwriter position: he testified during his deposition that he reminded Scelsa that Murphy had approved him for the direct endorsement course, which he needed to complete in order to get a waiver.

7

Although Khan has established a *prima facie* case, EverBank has offered a nondiscriminatory reason for not allowing him to take the direct endorsement course. Specifically, EverBank says that its policy detailing how to obtain direct endorsement certification "states that a candidate must be an Underwriter with at least one to three years underwriting experience" and that Khan was ineligible to take the course "because he was an Underwriter Liaison at EverBank, not an Underwriter." Defs.' Reply Br. at 6.

Because EverBank has articulated a nondiscriminatory reason for its action, Khan bears the burden of showing, in the summary judgment context, that a reasonable jury could find that EverBank's proffered reason is pretextual. "Pretext is a lie, specifically, a phony reason for some action." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (internal quotation marks omitted). The question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it offered . . . ." *Collins v. Am. Red Cross*, ___ F.3d ___, 2013 WL 856512, at *4 (7th Cir. Mar. 8, 2013).

In his response to EverBank's summary judgment motion, Khan did not address EverBank's stated reason for its denial of the opportunity to take the training course. He has thus failed to provide evidence from which a reasonable jury could find that EverBank's stated reason is pretextual. EverBank is therefore entitled to summary judgment on Khan's failure-to-promote claim.

**2.     Race, national origin, and gender discrimination claims**

Khan also contends that EverBank discriminated against him because of his race, national origin, and gender. He again seeks to prove discrimination via the

8

indirect method of proof, which requires a plaintiff to show that he is a member of a protected class, was performing his job satisfactorily, suffered adverse employment action, and was treated less favorably than similarly situated employees outside of his protected class. *Farrell v. Butler*, 421 F.3d 609, 613 (7th Cir. 2005). Once an employee has established a *prima facie* case, there is a presumption of discrimination, and the burden shifts to the employer, which must articulate a legitimate, non-discriminatory reason for the action. *Atunus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008). If the employer provides such a reason, the burden shifts back to the employee to prove that the employer's stated reason is a pretext for discrimination. *Id.* at 672.

Defendants do not dispute the first two elements – that Khan belongs to a protected class by virtue of his race, national origin, and gender and that he performed his job according to EverBank's expectations. Rather, defendants argue that Khan did not suffer an adverse employment action and that similarly situated employees outside of the protected class were not treated more favorably. The Court need address only the first of these points.

To be actionable, an adverse employment action must materially alter the terms or conditions of employment. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) (explaining that the terms of the antidiscrimination provision of Title VII "explicitly limit the scope of that provision to actions that affect employment or alter the conditions of workplace"). Thus adverse employment actions typically involve economic injuries. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). The Seventh Circuit has explained, however, that a materially adverse employment action can be found in a case in which the employee's work conditions

were changed in a way that subjected the employee to a humiliating, degrading, unsafe, unhealthful, or otherwise *significantly* negative alteration in his work environment. *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004).

Khan contends that he suffered an adverse employment action when, on October 9, 2009, Scelsa asked him to focus solely on distributing the incoming documentation regarding conditions to the appropriate loan files rather than work with any underwriters. He argues that this change in work was a *de facto* demotion that ultimately affected his ability to earn a bonus because he was no longer able to work with a "high producing team." Pl.'s Dep. at 255. The record reveals, however, that Scelsa frequently changed work group assignments and that Khan's re-assignment was temporary. Indeed, Khan concedes that this alteration in job assignments lasted at most nine days. "[N]ot everything that makes an employee unhappy is an actionable adverse action," and such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (internal quotation marks omitted). Khan offered no evidence that this action was anything more than temporarily irritating. Nor has he shown that the minor change in group assignments actually affected his ability to earn a bonus. The evidence shows that EverBank's bonus plan is based on the performance of the entire branch plus an individual's personal performance. In other words, contrary to Khan's contention, his bonuses were not based on the productivity of underwriters for whom he worked. For these reasons, the change in Khan's work assignments does not rise to the level of an actionable adverse employment action.

Khan also argues that he suffered an adverse employment action when

EverBank changed his work schedule by requiring him to work until 4:30 p.m. instead of 4 p.m. He contends that other underwriter liaisons had more flexible work schedules and that this change constituted an adverse employment action. In *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005), the court held that given the plaintiff's unique circumstances, a reasonable jury could conclude that an alteration of her work schedule constituted an adverse employment action. Specifically, the court noted the evidence suggesting that in altering the plaintiff's schedule, the employer sought to exploit a known vulnerability of the plaintiff – her reliance on her previously established flex-time schedule so that she could care for her son, who had Down syndrome. *Id.* The evidence also indicated that the schedule change "caused a significant (and hence actionable) loss" to the plaintiff because she was forced to use leave for two hours per day, causing her vacation and sick leave to drain away. *Id.* at 662-63.

The facts in *Washington* are distinguishable from those in this case. The evidence shows that the changed schedule parameters applied to everyone on staff at Rolling Meadows. On October 11, 2009, Scelsa e-mailed the entire office, asking everyone to provide her with their scheduled work hours so that Scelsa could ensure the scheduled overlapped. She explained that everyone would need to work until at least 4:30 p.m. because brokers often called the office late in the afternoon. No reasonable jury could find that Khan was singled out in any way; the schedule change applied uniformly to all underwriter liaisons. Because Khan has failed to point to any evidence suggesting that the new requirement was meant to exploit "a known vulnerability," no reasonable jury could find that it constituted an adverse employment

11

action.

Nor could a reasonable jury could find the evidence that Khan's desk was moved to the lobby and that he was asked to fetch coffee for his boss or his boss's boss on several occasions sufficient to establish actionable adverse action. Khan admitted during his deposition that Bill Fitzpatrick asked him to get coffee at most three times and that Scelsa asked him only once. Khan argues in his brief that "others in the office began asking him to make/fetch them coffee," but the e-mails that he cites as the only evidence to support this contention concerned making coffee for Fitzpatrick, except for just two, in which Khan advised co-workers that there was fresh coffee in the break room. Pl.'s Resp. at 6. These e-mails do not indicate that anyone asked Khan to make or get coffee for co-workers on these occasions, let alone that he was regularly tasked with doing so. In short, the evidence that Khan offers reflects only that he was asked to make coffee a handful of times for higher-ups. Though arguably disrespectful in this day and age, this is the sort of minor inconvenience that is insufficient to amount to actionable adverse action. *See generally Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (collecting cases).

As indicated earlier, Khan also provides evidence – and EverBank does not deny – that Scelsa caused his desk to be moved from the underwriting department first to an area outside her office and then to the lobby next to the entrance door. Relying on *Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987), Khan claims that this amounts to an actionable adverse employment action. But a review of the discussion in *Collins* reflects that without more, a desk or office move of this sort is an insufficiently significant alteration in his work conditions to permit his claim to survive summary judgment. For

12

instance, the plaintiff in *Collins* originally had a private office, a telephone at her desk, printed business cards, and listings in professional publications as a library consultant. *Id*. at 704. She was not only moved to a desk situated in a place where a receptionist would typically sit but also was transferred to a new job with significantly less responsibility. *Id.* Other cases (including those discussed in *Collins, see id.* at 703, likewise reflect that before a relocation can be considered actionable adverse action, it must affect the work environment must more dramatically than the evidence in this case reflects or must be combined with other actions that adversely affected the plaintiff's working conditions. *See, e.g.*, *Harris v. Richards Mfg. Co.*, 511 F. Supp. 1193, 1203 (W.D. Tenn. 1981) (plaintiff was transferred from high seniority, highly technical job in hygienic surroundings to "an unskilled, eyeball inspection of dirty and greasy in-process orthopedic goods in an isolated area of the plant"), *aff'd in part, rev'd on other grounds*, 675 F.2d 811 (6th Cir. 1982). In this case, Khan has not offered no evidence from which a reasonable jury could find that having his desk moved to the lobby, even when considered with the other actions Khan cites, *significantly* altered his work environment or conditions. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (noting that conditions must be changed in a way that subjects the plaintiff to a "significantly" negative alteration in her workplace environment). He only states in a conclusory manner that his desk was moved "to harass and humiliate him." Pl.'s Resp. at 9. Setting aside Khan's inadmissible speculation regarding EverBank's motive, this action cannot fairly be described as "objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002).

For these reasons, defendants are entitled to summary judgment on Khan's race, national origin, and gender discrimination claims.

**3.     Religious discrimination claim**

Khan alleges that EverBank discriminated against him based on his religion in that:  (1) EverBank posted a notice on its website prior to Christmas encouraging employees to donate to a charity and sent a subsequent reminder e-mail; and (2) his coworkers invited him out to a bar after work despite the fact that the tenets of his religion forbade him from consuming alcohol.  In religious discrimination cases, a plaintiff must show, as part of a *prima facie* case, that the defendant knew about the plaintiff's religion which, unlike a person's race or gender, is not ordinarily obvious. *Ozturk v. Motorola, Inc.*, No. 97 C 2130, 1998 WL 182515, at *5 (N.D. Ill. Apr. 16, 1998) (citing *Van Koten v. Family Health Mgmt., Inc.*, 955 F. Supp. 898, 901 (N.D. Ill. 1997), *aff'd*, 134 F.3d 375 (7th Cir. 1998)).

Khan has not responded to defendants' request for summary judgment on his religious discrimination claim.  He cites to no admissible evidence – deposition testimony, affidavit, or otherwise – to support his entitlement to relief on this basis.  In addition, as discussed earlier, Khan failed to respond to defendants' Local Rule 56.1(a) statement of facts with respect to this claim, thereby admitting to the following relevant facts:

- The e-mail requesting donation to the charity was sent to all EverBank employees;

- No EverBank employee or manager ever told Khan he would be penalized for not donating to the charity for which EverBank allegedly sought donation;

- Scelsa, Bordonet, Fitzpatrick, and McCombs did not know that Khan did not donate to the charity;

14

- Khan did not tell Scelsa, Bordenet, Fitzpatrick, or McCombs that he could not go to the bar because of his religion;

- No manager ever indicated to Khan that if he did not attend the bar social events it would be detrimental to his job; and

- Scelsa, Bordonet, Fitzpatrick, and McCombs did not what religion Khan practiced nor were they aware of the tenets of his religion during the time they worked with Khan at EverBank.

Defs.' Stat. of Mat. Facts ¶¶ 39-46. Given his admission of these facts, Khan cannot sustain his burden of establishing a *prima facie* case of religious discrimination. EverBank is therefore entitled to summary judgment on Khan's Title VII religious discrimination claim.

**4.     Hostile work environment claim**

Although Khan does not clearly articulate a hostile work environment claim in his response to defendants' motion for summary judgment, he has contended that he was subject to "harassment" at EverBank. To prevail on a hostile work environment claim, Khan must demonstrate that: his work environment was both objectively and subjectively offensive; the conduct was either severe or pervasive; it was based on his membership in a protected class; and there is a basis for employer liability. *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). Although one very severe act of harassment may create a hostile environment, that is a rare case. *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006). "In the typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Id.*

The only specific instance of harassment that Khan identifies in his response to defendants' summary judgment motion is an incident in which he says McCombs shoved him while he was in an office with Scelsa. Though this behavior, if it occurred,

15

would be inappropriate in a workplace, an isolated incident of this type hardly amounts to the sort of "hellish" conditions that may support a hostile work environment claim. *Lucket v. Menasha Material Handling Corp.*, No. 01 C 8967, 2005 WL 2420398, at *12 (N.D. Ill. Sept. 29, 2005) (citing *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 624 (7th Cir. 2004)). Thus the Court need not address the remaining elements of Khan's claim. Defendants are entitled to summary judgment.

**5.     Retaliation claim**

Khan also contends that EverBank constructively discharged him in retaliation for his complaints of race, national origin, and gender discrimination. A plaintiff may prove retaliation using either direct or indirect proof. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). On this claim, Khan proceeds under the direct method. Using this approach, Khan's claim survives summary judgment if he presents evidence that he engaged in an activity protected under the applicable statute; he suffered an adverse employment action; and there is a causal connection between the two. *See Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Khan contends that he engaged in protected activity that led to his constructive discharge from EverBank. A claim of constructive discharge requires the plaintiff to prove "that unlawful discrimination made [his] working conditions so intolerable that a reasonable person would be forced to resign." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007). There are two forms of constructive discharge. One type occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns . . .

." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (internal quotation marks omitted). This occurs when, "based on an employer's actions, "the handwriting [was] on the wall and the axe was about to fall." *Id.* (internal quotation marks omitted). Khan's contention that "he had had enough" amounts to an argument regarding the other form of constructive discharge – where an employer's actions force an employee to resign due to alleged discriminatory harassment. *Id.* at 331. For this sort of constructive discharge, courts "require the plaintiff to demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment." *Id.* (internal quotation marks omitted).

Although Khan has set forth a long list of incidents that he contends support a finding of constructive discharge – including being kept from acquiring direct endorsement training, having to retrieve coffee, and being physically relocated from the underwriting department to the lobby – no reasonable jury could find that these events, taken together, made his work conditions so intolerable that a reasonable employee would have felt forced to resign. An examination of cases in which evidence has been found sufficient to support of claim of constructive discharge indicates that negative working conditions be much more severe than those to which Khan was subjected. *See, e.g., Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment included repeated display of noose and implied threats of physical violence); *Patton*, 455 F.3d at 818 (constructive discharge where employer made sexually charged comments to employee, stalked employee, and engaged in four instances of physical contact with employee, including running his hand up employee's shorts and touching her underwear); *Robinson v.*

17

*Sappington*, 351 F.3d 317, 336-37 (7th Cir. 2003) (reversing grant of summary judgment on constructive discharge claim where plaintiff was involuntarily transferred back to work for her former supervisor who had previously threatened sexual assault and indicated he would continue to express his interest toward her); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge where supervisor brandished a firearm and held it to the plaintiff's head). Because no reasonable jury could find that Khan was constructively discharged, defendants are entitled to summary judgment on this claim.

### 6. Section 1981 claims against individual defendants

Khan finally alleges that Diane Scelsa, Robert Bordenet, Bill Fitzpatrick, and Buddy McCombs discriminated against him in violation of 42 U.S.C. § 1981. "The same prima facie requirements [apply] to both Title VII and 42 U.S.C. § 1981 discrimination claims." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Because the Court has concluded that defendants are entitled to summary judgment on all of Khan's claims under Title VII, his section 1981 claims necessarily fail as well.

### Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment [docket no. 103]. The Clerk is directed to enter judgment in favor of the defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 16, 2013

18